# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 27, 2012

## LANCE  VOGEL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Warren County**
**Nos. F12713, F12726, F12945     Larry B. Stanley, Judge**

_____

**No. M2012-00244-CCA-R3-PC - Filed March 26, 2013**

_____

The Petitioner, Lance Vogel, appeals the denial of post-conviction relief from his convictions of possession of over half a gram of methamphetamine with intent to sell or deliver, initiating a process intended to result in the manufacture of methamphetamine, possession of a controlled substance, and habitual traffic offender, for which he received an effective forty-year sentence.  In this appeal, he contends that he received the ineffective assistance of counsel.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and CHRISTOPHER (CHRIS) CRAFT, SPECIAL JUDGE, joined.

M. Trevor Galligan, McMinnville, Tennessee for the Petitioner-Appellant, Lance Vogel

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith Devault, Senior Counsel, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Joshua T. Crain, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The Petitioner was indicted in three separate cases.  He was released on bond in the first case and incurred additional charges after his first two arrests.  From the transcript of the guilty plea hearing,[1] we glean that in the first case, the Petitioner was indicted for possession of over half a gram of methamphetamine with intent to resell, a Class B felony; violation of the habitual traffic offender act, a Class E felony; and driving on a revoked driver's license third offense and possession of drug paraphernalia, Class A misdemeanors.

_____

[1] The Petitioner did not include his indictments or judgments in the record on appeal.

In the second case, he was indicted for initiating a process intended to result in the manufacture of methamphetamine, a Class B felony, and two counts of promoting the manufacture of methamphetamine, Class D felonies. In the third case, the Petitioner was indicted for initiating a process intended to result in the manufacture of methamphetamine, a Class B felony, promoting the manufacture of methamphetamine, a Class D felony, and simple possession of a controlled substance third offense, a Class E felony. On June 6, 2011, the Petitioner entered a guilty plea to the following: in the first case, possession of over half a gram of methamphetamine with intent to sell or deliver, a Class B felony, and violation of the habitual traffic offender status, a Class E felony; in the second case, initiating a process intended to result in the manufacture of methamphetamine, a Class B felony; and in the third case, initiating a process intended to result in the manufacture of methamphetamine, a Class B felony, and simple possession of a controlled substance third offense, a Class E felony. The remaining counts were dismissed. He was sentenced as a Range II offender to four years and a $250.00 fine; twelve years and a $4,000.00 fine; fourteen years and a $3,000.00 drug fine; fourteen years and a $3,000.00 drug fine; and two years and a $1,000.00 drug fine, respectively, for an effective sentence of forty years as a multiple offender.

**Plea Submission Hearing.** At the guilty plea colloquy, the Petitioner acknowledged he was guilty of the facts recited by the State. Regarding the first case, the State reported Officer Cantrell knew the Petitioner had a revoked driver's license and "was a habitual traffic offender." When he saw the Petitioner driving, he initiated a traffic stop. He then asked the Petitioner "whether or not there was anything in the vehicle that would be of concern to Officer Cantrell and Mr. Vogel offered to Mr. Cantrell that there was, in fact, methamphetamine in the vehicle underneath the seat in a box." The State continued:

> After taking Mr. Vogel into custody on the driving offense a search incident to the arrest was performed on the vehicle and there was a box recovered under the driver's seat. That box contained multiple items including 3.2 grams of methamphetamine broken out into individual packages as well as a quantity of methamphetamine still within a coffee filter. There were numerous 1x1 plastic baggies consistent with what Officer Cantrell knew to be the size and style baggy used to package methamphetamine or other narcotics for resale and there were also items within the box that were consistent with drug use, including at least one pipe and syringe.

The Petitioner was released on bond pending the first case, and on July 15, 2010, Officer Cantrell saw:

> the vehicle of Ernest Dodd at the residence that Officer Cantrell knew to be Lance and Connie Vogel's apartment. Given prior knowledge of Officer

Cantrell he contacted drug agents Tony Jenkins and Marc Martin who went to that location and set up in a position of observation on Mr. Vogel's apartment. After seeing Mr. Dodd and Ronnie Minton, both co-indicted along with Mr. Vogel in this case, leave Mr. Vogel's apartment, Detective Jenkins stopped those individuals, inquired as to their presence in Mr. Vogel's apartment and got consent to search their vehicle. Those individuals were subsequently released from the scene and Investigator Martin and Detective Jenkins then attempted to make contact with Mr. and Mrs. Vogel inside the apartment. After knocking for some period of time and not receiving any answer, Investigator Martin contacted Connie Vogel on her phone and advised her that he was outside and wanted to talk to her and she opened the door. After being advised as to why they were there, they asked for consent to search. That consent was denied and based upon the officers' observations of both Mr. Minton, Mr. Dodd, as well as the observations made at the apartment complex, those officers sought a search warrant.

Search warrant was drafted that same day and granted and a subsequent search of the apartment revealed multiple items used to manufacture methamphetamine . . . .

The Petitioner was again released on bond, and on December 22, 2010, the date of the third offense:

[L]aw enforcement was contacted by an in-home health care provider for Mr. Vogel's mother who was living at that time on Peers Street here in McMinnville. That in-home nursing associate advised law enforcement that whenever she got to the house to take care of Mr. Vogel's mother that particular day she entered into one of the bathrooms of the residence and within that bathroom is found a suitcase that contained multiple items that she did not know exactly their purpose but suspected that it was drug related. . . .

Based upon that information, again, law enforcement sought a search warrant of that particular residence, executed a search warrant that same day, and recovered multiple items . . . . Based upon those items Mr. Vogel was again taken into custody . . . .

The Petitioner acknowledged he had reviewed the plea agreements with an attorney who had answered all of his questions. He understood his charges and "what the State would have to prove in order to convict [him] of each of these offenses." He testified he understood

the consequences of pleading guilty and the rights he was waiving. He said he was entering his pleas freely and voluntarily.

The Petitioner timely filed a pro se petition for post-conviction relief. Counsel was appointed and an amended petition was filed alleging the Petitioner received ineffective assistance of counsel and entered his guilty plea unknowingly and involuntarily. On December 14, 2011, the post-conviction court conducted a hearing at which the Petitioner, his wife, and trial counsel testified.

**Post-Conviction Hearing**. The Petitioner testified that counsel had not interviewed Ronnie Minton, his co-defendant. The Petitioner said he told counsel that Minton had stated to the Petitioner that if he "snitched on him in any way, that [Petitioner] would do the rest of [his] life in prison and that [Minton] would go scot-free. . . . [and the Petitioner's] wife would go to prison." The Petitioner testified that "Ronnie Minton through threats and intimidation had me doing illegal drug activity for him." At the Petitioner's request, counsel spoke with the Petitioner's wife, Connie Vogel, regarding Minton's behavior. However, counsel told the Petitioner that Mrs. Vogel said that Minton "never threatened her with a gun, that she never felt that she was in any harm or danger or our kids in any harm or danger." The Petitioner also did not believe counsel was prepared for trial and complained that she insisted upon him entering a guilty plea rather than proceeding to trial. The Petitioner said counsel "wouldn't listen to what [he] was telling her" and "told [him] that [they] had little to no chance of winning at trial."

On cross-examination, the Petitioner admitted he had two prior felony convictions, for manufacture of methamphetamine and habitual traffic offender, and that he understood his rights when he entered guilty pleas on those offenses. He acknowledged that he received split confinement on those charges and violated his probation by failing a drug test for methamphetamine. The Petitioner agreed that "Ronnie Minton . . . didn't hold a gun to [his] head and cause [him] to use methamphetamine at that time." Regarding the third case, he admitted that he was trying to make methamphetamine in his mother's house without any threatening people around.

The Petitioner explained that his defense for the first two cases was duress. However, he also acknowledged that on June 26, 2010, and July 15, 2010, he provided statements of admission to the police which omitted any fear of Minton. Moreover, the Petitioner could not think of what Minton would say to counsel if she had interviewed him. He said, "I didn't know what [Minton] would say but I thought if [counsel] talked to him that she might get him to slip on something and say something. . . . I mean, no, I wasn't expecting him to come out and say I done this and I done that."

Regarding his third offense at his mother's house, the Petitioner explained that he was attempting to "set . . . up" other methamphetamine manufacturers even though he had not been asked by law enforcement to do so. The Petitioner further agreed that counsel told him the State might re-indict him on the first case to add his proximity to a school during one offense and that this would have increased his charges. He acknowledged that as part of his plea agreement, the State did not re-indict him. He agreed he considered the possibility of being sentenced to "way more than 40 years" and tried "to get the best bargain [he] could" when he entered his plea agreement. .

On re-direct examination, the Petitioner explained that his statements to police omitted his fear of Minton because he was "under harassment and duress because of [his] fear of future retribution from Mr. Minton."

Connie Vogel, the Petitioner's wife, testified that counsel asked her about Minton "once or twice" and that she told counsel "about him pulling a gun on [her] at Towne's Edge that day" in June and threatening her children. She told counsel that Minton "had [driven] by the house several times, that he was driving by the kids' house [and] that [she] was scared." She told counsel that the drugs involved in the first case belonged to Minton. To her knowledge, counsel never investigated these incidents and never subpoenaed any witnesses by the time the Petitioner entered his guilty pleas. She stated counsel seemed "overloaded" and "resented the fact that [Mrs. Vogel] asked her" if she could represent the Petitioner given that counsel usually concentrated on traffic cases.

On cross-examination, Mrs. Vogel admitted that she had a prior conviction for promoting the manufacture of methamphetamine. She also stated, "[Minton] wouldn't have said anything that would have helped. I understand that." She believed counsel "could have talked to [drug agents] Marc [Martin] and Tony [Jenkins] about what he actually said[.]" She acknowledged that the agents could report that she had called the police and told them that the Petitioner was using again and that "he was hanging out with all the wrong people and that his drug addiction was out of control." She agreed that her July 15, 2010 statement to police, which admitted her knowledge of "meth cooks in [her] apartment," omitted any fear of Minton. The State introduced the statement into evidence.

Counsel testified that drug cases are "a large part of what [she] do[es] every day" as an assistant public defender. Because the Petitioner was facing mandatory consecutive sentencing, counsel had "unfettered access" to the District Attorney's files, which included "undiscoverable" items. She recalled "many, many conversations" she had with the Petitioner, his wife, and the district attorneys. She said she "reviewed the videos" and photographs and "chased down dead-ends that [the Petitioner] sent [her] on." She agreed the Petitioner had been through drug court and said she advised him that "typically those who

have been through the [d]rug [c]ourt program and have been afforded all the opportunities he had been for treatment get sentenced more heavily in the future when they mess up." She said she "tried to persuade [the District Attorney] to let [the Petitioner] go to the Davidson County Drug Court program," and she "pursued every possible avenue that [she] could to try to mitigate his sentences."

Counsel said Mrs. Vogel told her that Minton pulled a gun on her but "did not say that she had seen him threaten [the Petitioner] at any point prior to that." Counsel said Mrs. Vogel "said she never saw [Minton] threaten Mr. Vogel." Counsel believed "it would be difficult to convince a jury" that the Petitioner was under duress by Minton because after the Petitioner's first offense, he continued to make methamphetamine with Minton. In the court's colloquy with her, counsel testified that Mrs. Vogel reported her children had witnessed "Mr. Minton's bizarre behavior," and counsel asked to speak with the children. However, Mrs. Vogel never granted permission and never described Minton's behavior around the children as "threatening."

On cross-examination, counsel stated that Minton was represented by counsel and that she could not talk to him. After Minton entered his plea, counsel attempted to contact him by phone but he did not return her calls. She admitted she had not subpoenaed any witnesses when the Petitioner entered his plea. She did not subpoena Minton, because she believed he was a State witness. Counsel also talked to Detective Martin about Minton's involvement in the offense. Finally, because the Petitioner invited Minton to live with his family, the State "found the story regarding the duress . . . to not be credible." Counsel advised the Petitioner to accept the plea because he could face sixty or more years if convicted at trial. On re-direct examination, she agreed that the evidence against the Petitioner was "overwhelming."

In its January 30, 2012 order denying relief, the post-conviction court stated:

This Court finds that counsel for the Defendant/Petitioner . . . did not fail to investigate[,] in fact the proof show[s] that [counsel] did investigate many false leads by Defendant.

. . . (Testimony of Ms. Connie Vogel is that Ronnie Minton scared her one time but no evidence that Ronnie Minton was the cause of Defendant/Petitioner's Methamphetamine involvement).

Testimony of Ms. Vogel was that she had called law enforcement informing them the Defendant/Petitioner had been using Methamphetamine very heavily.

. . . This Honorable Court finds there is no proof that Ronnie Minton would have said anything to help Defendant/Petitioner. Further, there is no evidence that Ronnie Minton would have implemented himself or that anything would have been mitigating by having the testimony of Ronnie Minton.

Therefore, this Honorable Court finds that Petitioner has not met his burden that Counsel's representation fell below the reasonable expectation of competency and there is nothing to show that the outcome could have been any better. In fact, the proof showed that had Petitioner gone to trial the outcome would have probably been worse.

It is therefore ORDERED that all issues raised are without merit and therefore this Petition is overruled.

The Petitioner then filed a timely notice of appeal.

## ANALYSIS

The Petitioner contends that the trial court erred in denying his petition for post-conviction relief. He argues counsel provided ineffective assistance of counsel by failing to investigate his case, subpoena witnesses, and prepare for trial.[2] The State responds that the Petitioner failed to prove his claims by clear and convincing evidence. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2010). The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

---

[2]On appeal, the Petitioner abandoned his claim that his "guilty plea [was] involuntarily entered without understanding of nature and consequences of the plea.." See Tenn. R. Crim. App., Rule 10(b).

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the Petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); see Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

The Petitioner contends he received ineffective assistance of counsel based on counsel's failure to adequately prepare a defense in his case. Because the Petitioner claims he committed his drug offenses under duress, he insists that counsel was ineffective by failing to interview or subpoena, Minton, his co-defendant. The post-conviction court determined that the Petitioner received the effective assistance of counsel and that the Petitioner's claim of duress was not credible. The record shows counsel attempted to contact Minton after he pled guilty and that Minton never returned counsel's call. Counsel also spoke with one of the investigators in the case, who informed her of his conversations with Minton. Significantly, the Petitioner and his wife did not know what Minton would say and conceded that Minton's statements would not be helpful. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Nothing in the record preponderates against the determination of the trial court. The Petitioner has failed to demonstrate either deficiency of counsel or prejudice therefrom. Accordingly, he is not entitled to relief.

## CONCLUSION

Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE